In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4558

VILLAGE OF ROSEMONT,

*Plaintiff-Appellant,*

*v.*

AARON JAFFEE, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5012—**Amy J. St. Eve**, *Judge.*

ARGUED FEBRUARY 7, 2006—DECIDED APRIL 3, 2007

No. 06-1984

EMERALD CASINO, INC.,

*Plaintiff-Appellant,*

*v.*

ILLINOIS GAMING BOARD, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6625—**James F. Holderman**, *Chief Judge.*

ARGUED JULY 12, 2006—DECIDED APRIL 3, 2007

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Approximately 15 years ago, the Illinois Gaming Board (IGB, or Board) issued a state riverboat gambling license to Emerald Casino, Inc. Although Emerald operated for a time in East Dubuque, Illinois, it closed that facility in 1997; two years later, it attempted to relocate its operations to Rosemont, Illinois, a suburb of Chicago near O'Hare International Airport. Hoping to reap economic advantage from the proposed casino, the Village of Rosemont decided to help Emerald along by constructing a large parking facility. To make a long story short, the relocation never got off the ground. Instead, Emerald became embroiled in administrative proceedings before the IGB, in which it risked losing its gambling license altogether, and some time thereafter, it filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

The first of the two appeals before us now, No. 05-4558, deals with an adversary proceeding Rosemont brought before the bankruptcy court. In that case, Rosemont claimed that it had a right to require the defendants (all members of the IGB) to cooperate in Emerald's efforts to transfer its principal asset, the gaming license, to a new holder. The bankruptcy court dismissed this action for failure to state a claim, and the district court affirmed. The second appeal, No. 06-1984, brings before us Emerald's objection to a different decision of the bankruptcy court. Emerald wanted the bankruptcy court to enjoin the IGB from revoking its gaming license and to require the IGB to drop the disciplinary proceedings that were pending against Emerald. Here too, the bankruptcy court dismissed the suit for failure to state a claim and the district court affirmed. We have consolidated the appeals for decision because of the close factual relation between them.

Since we heard oral arguments in these decisions, the Illinois appellate court has handed down a decision pertinent to these cases. See *Emerald Casino, Inc. v. Illinois Gaming Bd.*, 851 N.E.2d 843 (Ill. App. Ct. 2006) (*Emerald II*). In that opinion, the appellate court held that the state trial court had failed properly to enforce the appellate court's 2004 mandate stemming from *Emerald Casino, Inc. v. Illinois Gaming Bd.*, 803 N.E.2d 914 (Ill. App. Ct. 2003) (*Emerald I*). In *Emerald I*, the court had held that the IGB was required to grant Emerald's 1999 application for renewal and relocation of its license, subject to whatever revocation proceedings the IGB chose to conduct. We conclude that these developments do not materially change the nature of the questions presently before us, which relate to the bankruptcy court's power to require a state agency to refrain from exercising its regulatory power over a license holder. In both instances, the district court properly dismissed these actions, and we therefore affirm the two judgments before us. Emerald and Rosemont of course remain free to continue to pursue whatever state remedies may be available to them.

# I

We pick up the story here with Emerald's effort to move its license from East Dubuque to Rosemont. In April 1997, Emerald—which was then still operating in East Dubuque—applied for a license renewal, but it stated that it wanted to move from the Mississippi to Rosemont. The IGB turned down its application. Emerald filed an administrative appeal, but while the appeal was pending, it ceased operations. Later, the administrative law judge (ALJ) affirmed the Board's decision, but before Emerald's administrative appeal went back to the Board, the Illinois General Assembly passed an amendment to the Illinois Riverboat Gambling Act (IRGA), to be effective June 25,

1999. See 230 ILCS 10/11.2(a) (2004). The new section permitted "[a] licensee that was not conducting riverboat gambling on January 1, 1998" to "apply to the Board for renewal and approval of relocation to a new home dock location . . . and the Board *shall* grant the application and approval upon receipt by the licensee of approval from the new municipality." *Id.* (emphasis added). As the Illinois appellate court noted in *Emerald I*, this section described Emerald and only Emerald.

What happened on the 1999 remand to the Board may have surprised the drafters of § 11.2(a). In light of the new law, the Board declared the ALJ's order moot and allowed Emerald to file a new application for renewal and relocation. On July 7, 1999, the Board of Trustees of Rosemont approved Emerald's request for relocation, as the statute required. Some time thereafter, Rosemont constructed a parking garage that was designed to serve the hoped-for casino. To both Emerald's and Rosemont's dismay, however, the IGB announced on January 30, 2001, that it intended to deny Emerald's application. On March 6, 2001, it released its formal notice of denial and more: it issued a five-count disciplinary complaint seeking to revoke Emerald's license. Emerald sued in the Circuit Court of Cook County, seeking a declaration that § 11.2(a) required the IGB to approve its application; it also sought a writ of mandamus commanding the IGB to approve the application. Emerald stressed the fact that the statute imposed only two requirements on an applicant: first, that it submit a proper application, and second, that the affected municipality approve the plan. At that point, the law used the mandatory word "shall" to describe the Board's duties. The Cook County court ruled in favor of the Board, and Emerald appealed. In *Emerald I*, the state appellate court reversed and remanded. It concluded that "the legislature meant 'shall' to be mandatory, not directory, when it enacted section 11.2(a)." *Emerald I*, 803

N.E.2d at 925. It remanded the case to the circuit court with instructions to enter summary judgment in favor of Emerald and Rosemont.

In the meantime, the Board had been going ahead with its disciplinary proceeding. It began a trial in that proceeding in May 2002. About a month later, on June 13, 2002, Rosemont and four other creditors filed an involuntary bankruptcy petition against Emerald. They took this step because Rosemont believed that Emerald had tried, or was trying, to settle the disciplinary proceeding in a manner that was detrimental to its creditors, and because Emerald was refusing to reimburse Rosemont for the cost of constructing the garage. The bankruptcy court granted the petition, and later Emerald converted the case to a voluntary Chapter 11 proceeding.

At this point the Board suspended the disciplinary proceeding, while Emerald sought its approval for a proposed sale of the license. Emerald also tried to put together a reorganization plan that would be acceptable to both the Board and its creditors. In May 2003, Emerald filed a plan with the bankruptcy court that was unanimously supported by the members of the Board. The Attorney General of Illinois, however, withheld her consent to the plan. The Board, taking the view that it had no authority to settle the case without the Attorney General's consent, concluded that it had no choice but to recommence the disciplinary proceeding. It did so on June 3, 2003. This prompted Emerald to file an adversary proceeding in the bankruptcy court seeking declaratory and injunctive relief against the IGB; it argued that the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, would be violated if the administrative proceedings went forward.

The Attorney General then stated that she would not approve any plan of reorganization that resulted in a return of investment for the Emerald shareholders who

had been accused of wrongdoing in the administrative case. The Illinois legislature then re-entered the picture, passing another amendment to the IRGA on May 3. The new section 7.1 of the Act did several things: it recognized the legislature's intent to increase the amount of revenue available to the state; it allowed the Board to reissue a license that had been revoked or not renewed; and it provided that if a casino operator's license was revoked or expired without a renewal, the proceeds from any re-issued license would go to the state. After conducting a hearing on Emerald's request for relief under § 362, the bankruptcy court denied the motion, finding that the Board's actions fell within the exception to the automatic stay for a governmental entity's enforcement of its "police and regulatory power." See § 362(b)(4). The court rejected Emerald's argument that the possibility that the state might benefit financially from the revocation and reissuance of the license meant that it was indirectly engaged in debt collection activity. The district court affirmed on December 24, 2003. See *In re Emerald Casino, Inc.*, No. 03-5457, 2003 WL 23147946 (N.D. Ill. Dec. 24, 2003).

At that point Emerald was working both within and outside the bankruptcy proceeding to settle the case. Within the proceeding, it pursued a plan that contemplated the sale of its business to another entity, contingent on dismissal of the disciplinary proceeding. Outside the proceeding, it was negotiating with the IGB and the Attorney General over the conditions that it would have to obtain to gain consent to such a transfer and dismissal. The latter negotiations culminated in a side letter dated December 15, 2003 ("the First Side Letter"). This letter was not made a part of the bankruptcy plan, but the plan was conditioned on the successful implementation of the letter. The First Side Letter included several commitments and said that "[t]he AG and the IGB may revoke

their commitments under [specified paragraphs relating to both the bids and the stay of the disciplinary proceedings] if any of the [specified] events has occurred. . . ." At that point, Emerald would be entitled to 60 days' notice before the disciplinary proceedings could continue. The letter also expressly reaffirmed the state's sovereign immunity.

After the First Side Letter was signed, the bidding procedure it had outlined took place. In March 2004 the Board selected Isle of Capri, a publicly-traded company that operates 15 gaming facilities, as the winning bidder, subject to the final suitability review. Isle of Capri was willing to pay $518 million for the license.

This did not meet with the Attorney General's approval. In a letter to the Board dated March 25, 2004, the Attorney General raised numerous questions about the bidding process, the choice of Isle of Capri, and the selection of Rosemont as the site for the license. In addition, she noted that one of the conditions specified in the First Side Letter had failed: the Illinois appellate court in *Emerald I* had done something other than staying, dismissing, or affirming the circuit court's decision. (Shortly thereafter, a second condition failed: the bankruptcy court did not enter an order confirming the plan by April 1, 2004.) The Attorney General's letter emphasized the lack of a "fair playing field" among the participants in the bidding process; she criticized the decision to favor Rosemont just because it had engaged in the "unauthorized conduct" of building the parking garage and it was pressing a multi-million dollar claim in the bankruptcy case; she asked why the IGB staff recommendations were ignored; and she questioned the choice of Isle of Capri, which, she pointed out, had been disciplined frequently and fined by both state and federal regulators. Her letter concluded with a request to the Board to address publicly each of the concerns she had raised and

to consult with her staff. She warned that "[i]f you refuse to honor my requests, I reserve my option to resume the revocation hearing."

Dissatisfied with both the Board's and Emerald's responses, the Attorney General announced in May 2004 that she was ready to re-open the disciplinary proceeding. At the same time, the process for evaluating the reorganization plan was moving ahead. The members of the IGB still supported the proposed plan, under which Emerald's license was to be transferred to Isle of Capri. At the May 17, 2004, confirmation hearing before the bankruptcy judge, a majority of the Board's members testified in favor of the plan. The Attorney General filed an objection to the plan, complaining that as structured it would prevent the IGB from completing its disciplinary proceeding. Emerald and the Creditors disclaimed any intention to restrict the Attorney General's actions, telling the court that the plan did not "at this time seek to enjoin the IGB or the Attorney General." Emerald urged the judge to confirm the plan even if it were not "guaranteed to succeed." As the following comments reveal, the bankruptcy judge recognized the frailty of the reed on which all this stood, even if some of the parties did not:

> The Court: Is there anything that would prevent the resumption of the revocation proceeding and the revocation of the license here, despite confirmation of the plan that's presently before the Court, other than a majority vote of the Illinois Gaming Board?
>
> [Counsel for Emerald]: No.
>
> The Court: So that if the membership of the gaming board changed, or if members of the gaming board changed their mind, there would still be a potential for revocation?
>
> [Counsel for Emerald]: Well, Your Honor, there's all sorts of things that could happen.

On that understanding, the court confirmed the plan on May 17, 2004. (It later confirmed an amended plan on July 22, 2004, but the changes do not affect our analysis here.) It reserved the right to vacate the confirmation order if all conditions to its effectiveness were not satisfied or waived within 155 days after confirmation or any approved extension. The court made clear that the plan did not bind the Attorney General, who was not a party before it.

After confirmation, the conflict between the IGB and the Attorney General took a new turn. On June 11, 2004, the Attorney General filed an action against the Board and its members seeking to enjoin them from conducting a suitability review of Isle of Capri. Soon thereafter, the IGB adopted a resolution authorizing the execution of a Second Side Letter, which it issued on August 2, 2004. That letter purported to waive the failure of the conditions in the First Side Letter, insofar as the IGB was concerned. The letter was careful to note, however, that it spoke only for the Board (and implicitly not for the Attorney General). Shortly after this letter was released, two members of the IGB resigned.

Matters shifted again when the IGB was reconstituted in March 2005 with two new members. Shortly after their appointment, the Board at long last resumed the disciplinary proceedings. It appointed former U.S. Circuit Judge Abner Mikva to preside over those proceedings, and it refused to conduct any suitability review of Isle of Capri. These developments prompted Rosemont to file the complaint now before us in the bankruptcy court; it named all five members of the Board and the Board's interim administrator as defendants. The first part of the complaint sought specific performance of the IGB's commitments under the reorganization plan, including the completion of the suitability review and the termination of the disciplinary proceedings. The second part sought an

injunction against any conduct that interfered with the plan.

Emerald also filed a complaint in the bankruptcy court seeking specific performance of the same provisions of the plan that Rosemont had identified. It also asked for an injunction that would prevent the Board from revoking its license and transferring the license to any party other than Isle of Capri. As we have already noted, the bankruptcy court rejected both Rosemont's and Emerald's claims, and two different judges on the district court affirmed those decisions.

## II

With all this activity, it should surprise no one that developments in this case have continued apace while it has been pending before this court. Prior to oral argument in the Rosemont litigation (No. 05-4558), on November 15, 2005, ALJ Mikva issued a 38-page opinion in which he recommended that the IGB "make permanent its order of revocation and that any efforts by Emerald to engage in gambling in Illinois at any location be denied." This recommendation was based upon findings of fact that Emerald and its principals had dissembled about the plans to move to Rosemont, that the renewal application Emerald had filed on September 28, 1999, was neither accurate nor complete, and that both Emerald and its principals had not been honest in other respects. Emerald had also permitted ineligible parties to invest in its casino. The IGB accepted this recommendation and formally revoked the license on December 20, 2005. On December 21, 2005, after rejecting several motions that would have prevented the Board from acting at all, this court enjoined the IGB from selling or reissuing the license pending further court order. In this way, we hoped, we would minimize federal interference in ongoing state proceed-

ings, and at the same time preserve the status quo as it related to the federal appeals.

On June 13, 2006, the Illinois appellate court handed down *Emerald II*. The precise question before the court was whether the trial court had enforced the mandate from *Emerald I*. The appellate court recalled that its holding in *Emerald I* had been that § 11.2(a) of the IRGA imposed a nondiscretionary duty on the Board to "resurrect" Emerald's license. The trial court, however, interpreted the mandate to mean that Emerald had a right to have a four-year license granted effective *September 24, 1999*, in an order dated June 9, 2005; and that is what the Board did on June 29, 2005. Naturally, this accomplished nothing from Emerald's point of view, since the newly resurrected license expired by its own terms on September 24, 2003, nearly two years before the Board's order, and three months *before* the Illinois appellate court issued *Emerald I*. The court found this response to its earlier order unacceptable, stating that it "reject[ed] the notion that this court is in the business of making empty and useless gestures." 851 N.E.2d at 846. The court also noted that the Board's action was inconsistent with its position in the bankruptcy proceeding, where the Board was taking part in the process that would auction off Emerald's license interests. *Id.* at 847.

The appellate court took pains to make clear that its holding addressed only the reissuance of the license and the enforcement of the court's own mandate:

> We stress that our only intent is to address the question of whether our mandate has been enforced. Nothing else. Whether Emerald and Rosemont possess sufficient moral fiber to conduct and host a gambling business is not now our concern. We said before and we say again: "Nothing in section 11.2(a) prevents the Board from moving to revoke Emerald's license."

> [*Emerald I*, 803 N.E.2d at 926.] The supreme court
> said it, too: "The Act's license revocation provision
> still applies to Emerald with full force (230 ILCS
> 10/5(c)(15) (West 2000), and revocation proceedings
> have, in fact, been initiated against it." *Crusius [v.*
> *Illinois Gaming Bd.]*, 837 N.E.2d [88, 98-99 (Ill. 2005)].

851 N.E.2d at 848. Indeed, as the appellate court acknowl-
edged, the state supreme court in *Crusius* could not have
been any clearer:

> We further note that section 11.2(a) does not under-
> mine the Riverboat Gambling Act's goal of strict
> regulation simply because it requires the Board to
> grant Emerald's application for renewal and relocation.
> As mentioned, the Act contained no provisions regard-
> ing relocation prior to the enactment of section 11.2(a).
> Therefore, the amendment of the Act to allow for
> relocation did not diminish the regulatory authority of
> the Board in any way. As for license renewal, it is only
> one facet of the Board's regulatory authority. If any
> riverboat gambling licensee, including Emerald, fails
> to comply with the Act's requirements, the Board has
> the authority to investigate and take appropriate
> disciplinary action. 230 ILCS 10/5(c)(5) (West 2000).
> The Act's license revocation provision still applies to
> Emerald with full force (230 ILCS 10/5(c)(15) (West
> 2000)), and revocation proceedings have, in fact, been
> initiated against it. Thus, regardless of Emerald's
> eligibility for license renewal and relocation under
> section 11.2(a), if Emerald has failed to comply with
> the requirements of the Act, it could lose its riverboat
> gambling license in accordance with the Act's provi-
> sions, as is the case with any other licensee.

837 N.E.2d at 98-99. *Emerald II* concluded with the
following order: "[W]e direct that immediately on receipt of
our mandate the trial court shall order the Board to issue

Emerald's license for renewal and relocation within 30 days of the receipt of the trial court's order. The license shall be effective as of the date of issuance and shall remain in effect for four years, *subject to revocation proceedings*." 851 N.E.2d at 848 (emphasis added).

As we noted above, the Board had already completed the disciplinary proceeding and issued a order revoking Emerald's license on December 20, 2005. Although it does not quite say so in so many words, Emerald is now arguing that *Emerald II* implicitly set aside that order of revocation, since the decision came some six months after the order. The state takes the position that the qualification in the court's order excepting "revocation proceedings" can mean only that *Emerald II* left the revocation order untouched. In any event, the state points out in a supplemental letter filed January 25, 2007, that proceedings challenging the revocation order are pending before the Illinois appellate court.

### III

We return, at last, to the somewhat narrow issues before this court, all of which have to do with the question whether the bankruptcy court should have acted to compel the IGB and its members to carry through with the terms of the reorganization plan that the bankruptcy court confirmed in its order of May 17, 2004. That plan, recall, which at one time had the support of a majority of the Board (but later lost this support) and which did not have the support of the Attorney General, contemplated the auction of Emerald's license and its transfer to the winning bidder, and it contemplated that the casino facility would remain in the Village of Rosemont. We are satisfied that it would still be possible to grant this relief, if we thought that it was appropriate. *Emerald II* took care of the renewal of Emerald's license, and our order staying any

future transfer or reissuance of the license preserved the possibility that the IGB could rescind its order of revocation and perform as Emerald and Rosemont would like. We therefore proceed to the merits of the appeals.

A.  Rosemont's Appeal (No. 05-4558)

Rosemont's appeal gives great prominence to the First Side Letter, which was signed in December 2003. It argues that the letter became an enforceable part of the bankruptcy plan, because it was attached as an exhibit to the plan and was referred to in § 5.10 of the plan. The district court apparently agreed with this position, as it said several times that the "December 15, 2003 letter agreement [was] incorporated in the Plan by reference." This assumption favors Rosemont, and so we proceed on that basis. In the end, it does not help Rosemont, because the act of incorporating the First Side Letter does not change the content of that letter, and it is the content that should be Rosemont's concern.

Nothing in the December 2003 letter required the Attorney General to do anything, including to abandon the disciplinary proceedings. Instead, the Attorney General explicitly reserved the right to reactivate those proceedings, if certain conditions were not met, and it is undisputed that those conditions indeed failed. Rosemont is thus forced to supplement its argument based on that letter with two additional pieces of data: first, the fact that a majority of the Board members testified in favor of the First Side Letter before the bankruptcy court, and second, the fact that the Board later issued the Second Side Letter (before it later decided to withdraw its support from both letters). We see two problems with this position: first is the idea that some individual members of the Board can somehow estop the full Board from acting in an ongoing proceeding; second is the undisputed fact that the Attorney

General was not a party to the Second Side Letter, and she had the power to pursue the disciplinary proceeding before the Board. The Board recognized this, both in the Second Side Letter and elsewhere throughout these complex proceedings.

Rosemont also argues that the bankruptcy court had the power to enforce the plan (which it believes incorporated a firm obligation on the part of the Board to permit the sale of Emerald's license to Isle of Capri) under § 1142(b) of the Bankruptcy Code, 11 U.S.C. § 1142(b). That section, however, says only that "[t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." We agree with the Fifth Circuit that this language does not confer any substantive rights on a party apart from whatever the plan provides. See *In re Brass Corp.*, 301 F.3d 296, 306 (5th Cir. 2002). Instead, it "empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan." *Id.* This also means that § 1142(b) is of no help to Rosemont insofar as it is looking for a source of power for the bankruptcy court to enforce the Second Side Letter, which was issued after the plan was confirmed. For that reason alone, we think it indisputable that the Second Side Letter could not have been part of the plan.

Taking another approach, Rosemont urges us to find that the bankruptcy court independently had the authority under 11 U.S.C. § 105(a) to compel specific performance of the Board's alleged commitments. That statute is, more or less, a "necessary and proper" provision of the Bankruptcy Code; it provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a). As Rosemont sees it, the only asset of any value in Emerald's estate is the gambling license. When the entire *res* of an estate is threatened by unlawful action (here, the disciplinary proceeding in its view), the bankruptcy court has the duty to step in and do whatever is needed to protect the estate for the creditors. Once again, however, Rosemont is mistaken if it thinks that § 105(a) is an independent source of rights. As the First Circuit put it:

> Section 105(a) empowers the bankruptcy court to exercise its equitable powers—where "necessary" or "appropriate"—to facilitate the implementation of other Bankruptcy Code provisions. Although expansively phrased, section 105(a) affords bankruptcy courts considerably less discretion than first meets the eye, and in no sense constitutes a roving commission to do equity. Instead, the equitable discretion conferred upon the bankruptcy court by section 105(a) is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code.

*In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 27 (1st Cir. 1997) (citations and internal quotations omitted).

Although Rosemont may be disappointed that it built an expensive parking garage (which, for reasons we do not fully understand but we accept at this stage of the case, it insists cannot be devoted profitably to other uses) in the hopes that a casino would open soon within the Village, it should have paid closer attention to the limitations inherent in the confirmed plan. The bankruptcy judge's warning could not have been any plainer: he alerted the parties to the fact that the membership of the Board might change, and that the license might be revoked, and they all said that they were willing to go forward with this plan anyway. Even if one accepts every factual allegation in Rosemont's complaint, as we of course

must do when a case has been dismissed under FED. R. CIV. P. 12(b)(6) and FED. R. BANKR. R. 7012, there is no legal theory that would allow the bankruptcy court to force the IGB and the Attorney General of Illinois to discontinue the disciplinary proceeding against Emerald.

Rosemont also raised three other issues before this court: first, that the district court erred by rejecting its claim for injunctive relief; second, that the district court erred in its conclusion that Rosemont had not stated a claim against the Board members for violating its "right to statutory due process"; and third, that the district court wrongly concluded that it lacked *in rem* jurisdiction over the license. We see no merit in these points, as we now explain.

Common to several of Rosemont's arguments is its position that the IGB waived the state's sovereign immunity, and so the court was empowered to grant injunctive relief against the Board as an entity rather than against any individual members. See *Ex parte Young*, 209 U.S. 123 (1908). The bankruptcy court found that the Board had not invoked the jurisdiction of the federal court: it had neither filed any request for relief nor had it expressly waived sovereign immunity. To the contrary, at all times the Board and the Attorney General made clear their intention to assert sovereign immunity as a defense, should that become necessary. Both the First and the Second Side Letters conclude with statements to this effect, and the plan noted that "[n]othing in this plan and no distribution or transaction that occurs pursuant to this plan shall be deemed a waiver by the IGB or by the state of Illinois . . . of their sovereign immunity."

If Rosemont is arguing that the Board, by asserting its regulatory authority over the license, somehow waived its sovereign immunity in the bankruptcy court, we must reject that position. This is not a case like *Central Virginia*

*Comm. College v. Katz*, 546 U.S. 356 (2006), in which a state agency was defending an action by a trustee to recover a preferential transfer of funds. There the question was simple: who gets the money, the bankruptcy estate or the state agency? The Board here had no claim against Emerald; it was not Emerald's creditor. Rosemont takes issue with the latter proposition because, under the IRGA, *if* the license is revoked and *if* the state later re-issues it to another party, the state will be paid for the new license (and, of course, those funds will not be available to pay the prior licensee's creditors). That possible chain of events, however, is not enough to make the state or the Board one of Emerald's creditors. Nor do we accept the argument that we should treat Emerald's license as a *res* with respect to which the bankruptcy court had the authority to displace the state's police power. If the question were merely who was entitled to a license that was not subject to revocation, we would have a different case. But whatever property right the license conferred has always been subject to, or conditioned on, the regulatory powers of the state. Nothing in the bankruptcy laws permits the court to enjoin the Board, a state regulatory agency, from exercising the police powers of the state to regulate the gambling industry.

We have considered the other arguments Rosemont has pressed and find them equally unpersuasive. There is no need for a preliminary injunction at this point, given the developments in the case we have already outlined. Thus, to the extent that preliminary injunctive relief was requested, it is denied as moot. We affirm the judgment of the district court in Rosemont's appeal.

### B.  Emerald's Appeal (No. 06-1984)

Emerald presents two issues in its appeal: (1) whether the district court erred when, as Emerald puts it, it failed

to enjoin the IGB defendants from "expropriating" the only valuable asset in Emerald's estate, and (2) whether the court was wrong to conclude that, under Emerald's chapter 11 plan, it lacked authority to require the IGB defendants to comply with the terms of "agreements they voluntarily entered into in connection with the Plan." Much of what we have said thus far points the way to the resolution of these arguments too—in particular our finding that nothing in the plan compelled the Attorney General or a newly reconstituted Board to refrain from pursuing the disciplinary proceedings against Emerald. We add here only what is necessary to explain why we are affirming the district court's judgment in Emerald's appeal.

We have already noted that the Supreme Court's decision in *Katz* recognized that the state's sovereign immunity does not extend to the adjudication of preferences in a bankruptcy proceeding. Like Rosemont, however, Emerald is not arguing that the IGB or the state of Illinois wants to adjudicate a claim to funds that might or might not be part of its estate. The IGB instead has consistently argued that it is entitled to exercise the state's regulatory authority over the license. We see nothing in either *Katz* or *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004) (noting that bankruptcy proceedings are *in rem*), that undermines the state's sovereign immunity for this kind of claim. Even if we are wrong, however, it is not necessary to decide that issue today. Nothing in the plan promises that the state will cede its regulatory authority in this way, and it is easy to understand why. Hypothetically, a group of rogues and thieves could seize control of a gambling license, and the state would have every reason to investigate and, if need be, to revoke the license.

On a more fundamental level, it is well established that one Congress, or one legislature, cannot bind a future Congress or legislature with respect to police power

legislation. See *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932) ("[T]he will of a particular Congress . . . does not impose itself upon those to follow in succeeding years."). It is for each elected legislature to express the will of the people as it sees fit. The only exception to this rule applies when the legislature intends to confer a vested right on the recipient, as it might with respect to a land patent, for example, or if it intends to create a binding contract. Nothing in the IRGA even hints at the idea that a gambling license, once granted, is a vested right in the hands of the operator. To the contrary, the statute expressly states that the Board has the power "[t]o revoke or suspend licenses, as the Board may see fit and in compliance with applicable laws of the State regarding administrative procedures. . . ." 230 ILCS 10/5(c)(11). Compare *In re Barnes*, 276 F.3d 927, 928 (7th Cir. 2002) (indicating that although a liquor license is "property" for some purposes it can be revoked upon proof of misconduct). Thus, the idea that a few members of the IGB, through their testimony before the bankruptcy court, could tie the hands of the Board as a whole after its membership changed with respect to the question whether to pursue a disciplinary proceeding is untenable.

Although Emerald argues that the bankruptcy court had the power to enter the injunction it wanted, because bankruptcy is an *in rem* proceeding, we agree with the district court that the present case does not implicate that power. Emerald wants the bankruptcy court to enjoin a state regulatory agency, the IGB, from exercising its powers under a state statute to regulate the gambling industry. The Bankruptcy Code does not presume to confer any such power on the district court or its bankruptcy unit. To the contrary, § 362(b) of the Code has this to say about the matter:

  (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section

5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

* * *

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power . . . .

11 U.S.C. § 362(b)(4). This language establishes that even though Emerald's license is for some purposes "property of the estate," see 11 U.S.C. § 541, the Code forbids the bankruptcy court from interfering with the government's police and regulatory powers.

Emerald's position is similar to that of one of the parties in *Nelson v. La Crosse County Dist. Atty. (State of Wisconsin)*, 301 F.3d 820 (7th Cir. 2002). In *Nelson*, a married couple filed for personal bankruptcy. After Mrs. Nelson received an individual discharge, the state filed a separate criminal charge against her for crimes connected with her operation of a business. *Id.* at 823. In response, Mrs. Nelson commenced an adversary proceeding in her individual bankruptcy case against the District Attorney's Office and the individual DA who was handling her prosecution. She argued that they were violating 11 U.S.C. § 524, which forbids creditors from taking steps to collect a discharged bankruptcy debt from the debtor by initiating a criminal action in order to obtain a restitution order. *Id.* at 824. Like Emerald, Mrs. Nelson asked for injunctive relief. This court concluded that the suit was barred for three reasons: there was no valid abrogation of the state's Eleventh Amendment immunity; the state had

not waived its immunity; and the proceeding was not within the bankruptcy court's *in rem* jurisdiction. Although the Supreme Court disagreed in *Katz* with our reasoning on the Eleventh Amendment point, both the outcome and the other two reasons remain sound. Although the IGB has not been conducting a criminal proceeding, we find the analogy to *Nelson* apt, and we regard *Nelson* as further support for the conclusion we reach here.

The last point we address is Emerald's argument that the IGB is bound by the commitments the former Board made in the Second Side Letter of August 2, 2004. This was the letter that the Board sent to Emerald in which it agreed to conduct a suitability review of Isle of Capri and to suspend, and ultimately to dismiss, the disciplinary proceeding. As we have already explained, the Second Side Letter was not the IGB's last word on the subject: later, in the spring of March 2005, the reconstituted Board decided to resume the disciplinary proceedings. In addition, as we have noted several times, the Attorney General was not a party to the August letter and the Board even then recognized that it had no power to bind her. The August 2004 letter was, as the bankruptcy judge predicted, at best an indication of the Board's present intentions; it did not set those intentions in stone so that they tied the hand of future Boards.

## IV

We take no position on the question whether Emerald's license should or should not have been revoked. We hold here only that nothing in the confirmed plan of reorganization that the bankruptcy judge approved required the IGB to refrain from pursuing its disciplinary proceeding, and nothing in either bankruptcy law or more general principles of law would support the kind of interference with the state administrative proceedings that Emerald

and Rosemont have requested. We therefore AFFIRM both judgments of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*